UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE BARTON GROUP, INC., <br><br> Plaintiff, <br><br> -against- <br><br> NCR CORPORATION, <br><br> Defendant. | 08 Civ. 5679 (FM) |

## DECLARATION OF SEAN C. SHEELY IN SUPPORT OF
## PLAINTIFF THE BARTON GROUP INC.'S POST-TRIAL APPLICATION

SEAN C. SHEELY declares under penalty of perjury as follows:

1. I am a member of the law firm Holland & Knight LLP, attorneys for the Plaintiff The Barton Group, Inc. ("Barton") in the above-referenced action and respectfully submit this Declaration in Support of Barton's post-trial motion for declaratory judgment and specific performance concerning NCR's future international sales.

2. Annexed hereto as Exhibit 1 is a true and correct copy of the relevant excerpt from the Joint Pre-Trial Statement.

3. Annexed collectively hereto as Exhibit 2 are true and correct copies of the relevant excerpts from the trial transcripts referenced in Barton's memorandum of law.

4. Annexed hereto as Exhibit 3 is a true and correct copy of the Jury Verdict Sheet.

I declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Dated: New York, New York
       January 7, 2011

                                                    _____
                                                    SEAN C. SHEELY

# 9797321_v1

#10029275_v1

# Exhibit 1

FILE COPY
H & K

SERVED BY MAIL/HAND/EMAIL _____
SUBMITTED/FILED/EMAIL _____
RECEIVED BY MAIL/HAND/EMAIL _____
ENTERED _____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE BARTON GROUP, INC.

    Plaintiff

-against-

NCR CORPORATION,

    Defendant

08 Civ. 5679 (LTS) (FM)

**JOINT PRE-TRIAL STATEMENT**

Pursuant to Fed. R. Civ. P. 16 and 26, the Local Rules for the Southern District of New York, and this Court's Pre-Trial Scheduling Order dated June 10, 2010, Plaintiff The Barton Group, Inc. ("BGI") and Defendant NCR Corporation ("NCR") hereby file this Joint Pre-Trial Statement, and state as follows:

**A.  Concise Statement Of The Legal Issues To Be Decided:**

Plaintiff's Statement:

1.  Whether NCR materially breached and defaulted on its obligations to BGI under the First Amended Business Generation Agreement.

Defendant's Statement:

1.  Whether BGI materially breached its obligations to NCR under that Agreement.

**B.  Concise Statement Of The Material Facts Not In Dispute**

The parties agree to the following undisputed facts:

1.  BGI is a New York corporation.

2.  BGI is owned and operated by Lewis Barton and he is BGI's sole employee.

3.  During the period of time relevant to this dispute, BGI provided consulting services to food service companies related to food packaging and food processing operations.

15. On or about September 3, 2003, BGI and NCR executed the First Amended Business Generation Agreement which has been marked for identification as Plaintiffs' Exhibit 63.

16. Under the terms of the First Amended Business Generation Agreement, NCR appointed BGI as its exclusive sales agent for additional projects with McDonald's, as set forth in that agreement.

17. The First Amended Business Generation Agreement does not limit NCR's obligation to pay BGI a commission for sales to McDonald's in any geographic regions.

18. During a meeting at McDonald's Innovation Center on September 26, 2003 with representatives from BGI and NCR, a McDonalds' representative identified a potential application for using the proposed solution demonstrated by NCR and BGI on a new line of deli sandwiches that McDonalds was preparing to launch referred to as "oven select" or "toasted deli" (herein "Oven Select").

19. On July 1, 2004, NCR sent a letter to BGI supplementing the First Amended Business Generation Agreement to confirm the understanding between NCR and BGI that McDonald's Oven Select label project is included within the scope of the First Amended Business Generation Agreement.

20. In 2004, 2005 and 2006, NCR sold the following products to McDonalds related to the Oven Select label project in the United States, Canada and the United Kingdom:

| NCR PRODUCT ID | NCR DESCRIPTION | REGION |
| --- | --- | --- |
| 9023-0123 | Labels. Box of standard Pressure Sensitive Labels and cleaning pen | US |
| 9023-0175 | Labels. Box of standard Pressure Sensitive Labels | US |
| s-151767 | Labels. Box of standard Pressure Sensitive Labels | Canada |

# Exhibit 2

# In The Matter Of:

# THE BARTON GROUP, INC v.
# NCR CORPORATION

*VOLUME 4*
*December 6, 2010*

*TRIAL*
*SOUTHERN DISTRICT REPORTERS*
*500 PEARL STREET*
*NEW YORK., NY 10007*
*212-805-0300*

Original File 0C6ABARF.txt, Pages 519-741 (223)

1  that the title says?
2  A.  All of these are under the 16-year forecast horizon for
3  illustration.  You can get all the other figures.  Everything
4  matches up on the other charts.
5  Q.  Right.  This is all by illustration.  And they are all net
6  present value.  This is all with your discount rate included,
7  correct?
8  A.  Correct.
9  Q.  And one other thing.  All of these numbers that we've been
10 looking at are for the United States only, correct?
11 A.  That's correct.
12 Q.  So far everything you've talked about this morning is for
13 the sales that NCR reasonably expects in the future for
14 McDonald's in the United States, correct?
15 A.  Thus far, that's correct.
16 Q.  Now, were you able to calculate Barton's, Mr. Barton's
17 expected commissions from NCR's international sales to
18 McDonald's for the sticky label project?
19 A.  I was not able to do that, no.
20 Q.  What inputs would you need or would you want in order to
21 calculate future forecasts for international sales?
22 A.  Well, one would want some more information from NCR to do
23 that.  I mentioned earlier that NCR had some uncertainty itself
24 about this, in connection with Mr. Keeton's forecasts for 2012
25 that he prepared in 2009.  But if I wanted to then try to

1  quantify that, I'd need the same sort of information that I
2  used in those calculations: the number of international stores,
3  the penetration rate, the prices, etc.
4  Q.  Now, the number of international stores, that's one of the
5  inputs, you could identify that information, right?  Were you
6  able to identify what the number of McDonald's stores outside
7  the U.S. is?
8  A.  Yes.
9  Q.  And how many McDonald's restaurants are there outside of
10 the U.S.?
11 A.  There is approximately 18,000 McDonald's stores outside of
12 the U.S.
13 Q.  But you didn't have information about what the price and
14 the usage would be outside of the U.S., correct?
15 A.  I did not.
16 Q.  If you assumed that international sales to McDonald's had
17 the same usage, that McDonald's restaurants use outside the
18 U.S. the same number of rolls per week per year, and if you
19 assumed that McDonald's stores outside the U.S. paid the same
20 price as they do in the U.S. for the rolls, for sticky paper,
21 as McDonald's inside of the U.S., would you be able to
22 calculate how much the commissions would be to Barton for a set
23 of 1,000 stores?
24            MR. RAFFAELE:  Objection.
25            THE COURT:  Sustained.

1           (At the sidebar)
2           MR. SHEELY:  Just to be clear, I'm not sure I
3   understood the basis for your Honor's sustaining the objection
4   with respect to international sales.
5           THE COURT:  Well, let me first hear --
6           MR. SHEELY:  The predicate for the -- it says if A and
7   if B and if C, and none of those were established.  But the "if
8   A" --
9           THE COURT:  Well --
10          MR. SHEELY:  I'm sorry.
11          THE COURT:  The reason I sustained it was speculative,
12  that it called for speculation, which, that may not be
13  precisely what Mr. Greenberg was saying.
14          MR. GREENBERG:  I intended to mean that, and if I
15  didn't state it very well, I apologize.
16          MR. SHEELY:  So there has not been any testimony with
17  the assumption that the international price and usage looks
18  like the U.S.
19          THE COURT:  Not without some predicate for assuming
20  that there's some --
21          MR. GREENBERG:  Which is what I think I just said.
22          MR. SHEELY:  Two housekeeping things, then.  One is, I
23  put into evidence 366, 67, 68, and 69, which reflect those
24  calculations.  Perhaps we should pull those out.
25          MR. GREENBERG:  I move to strike those exhibits.

            When you go internationally, it's a totally different
market.  For instance, I met with --
            MR. SHEELY:  Objection, your Honor.
            THE COURT:  Well, yes.  And I think you need to
establish a basis for the testimony.
Q.   What is your basis for the testimony you are giving,
Mr. Bogan, about international?
A.   When you look at --
Q.   No, no.  I'm sorry, Mr. Bogan.
            MR. GREENBERG:  Let me rephrase, if I may, your Honor.
Q.   My question wasn't clear, I guess, Mr. Bogan.  Let me try
it this way.  What is your basis for knowledge about
international sales at McDonald's?
A.   Could you ask that again?
Q.   How do you come to the knowledge you were about to tell us?
A.   I've met with McDonald's Japan, I've met with McDonald's
Europe.
Q.   Have you observed McDonald's stores in those places?
A.   Yes.
Q.   So tell us about what you've observed in terms of special
order sandwiches in those places.
A.   OK.  In the Japanese market, I met with them a few months
ago, and in their market, whereas the U.S. has 50 percent
exceptions, in the Japanese market it's 2 percent so.  2
percent of the sandwiches are changed.  And the reason, because

1  of that, it's just culture.  They're not -- the Japanese
2  culture don't, don't ask for all these changes and so forth.
3  Q.  And in Europe?
4  A.  And in Europe it's very similar.  They don't have the need
5  for the grill application, and nor have we had any success with
6  the grill in Europe because the percent of changes and the
7  exceptions being asked for is very small.
8  Q.  So what have you managed to sell in Japan and Europe and --
9  let's do Japan and Europe.  What have you managed to sell by
10 the way of RoL?
11 A.  In Japan, zero, today.  We have have had no success with
12 that.  In Europe, we have a two-store pilot, in Italy.  And
13 there's a few stores that are piloting it in France.
14        MR. GREENBERG:  Thank you, your Honor.
15        THE COURT:  Mr. Sheely.
16 CROSS EXAMINATION
17 BY MR. SHEELY:
18 Q.  Mr. Bogan, good afternoon.  With respect to where we just
19 left off on international sales, you mentioned in France, NCR
20 is currently selling a 58 millimeter version of RoL in France
21 for a drive-through application, correct?
22 A.  No, not currently.
23 Q.  Did NCR make a 58 millimeter?
24 A.  Yes.
25 Q.  And what is that made for?

Case 1:08-cv-05679-FM   Document 52   Filed 01/07/11   Page 12 of 16
650

0C6ABAR4ps							Bogan - cross

1        What did they make this for?
2   A.   For some pilot stores that they've stopped.
3   Q.   Where?
4   A.   In France.
5   Q.   For what purpose?  For what application?
6   A.   Drive-through.
7   Q.   OK.  Mr. Bogan, you assumed your new position, senior vice
8   president and general planning at the consumables division, in
9   January 2008.  Is that correct?
10  A.   Correct.
11  Q.   And when you sent the letter to Mr. Barton stopping the
12  payments that he was receiving from NCR for the labels to
13  McDonald's, that was only a few months into your new position
14  in the consumables group, correct?
15  A.   Yes.
16  Q.   In fact, that letter, I think, was sent on February 22,
17  2008.  That's approximately seven weeks from the official date
18  that you became the general manager of the consumables
19  division, right?
20  A.   Yes.  That's when we suspended the payments.
21  Q.   And you made the decision to suspend the payments to
22  Mr. Barton in 2008 based on the information that was available
23  to you at that time, correct?
24  A.   Yes.
25  Q.   You didn't have personal involvement with the sticky label

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

# Exhibit 3

<u>The Barton Group, Inc. v. NCR Corp., 08 Civ. 5679 (FM)</u>
<u>JURY VERDICT SHEET</u>

1.   Do you find that plaintiff, The Barton Group, has established by a preponderance of the evidence that either or both of the terms "Sticky Label Project" and "Alternative Project", as set forth in the 2003 contract, cover the RoL product that NCR sells to McDonald's?

Yes <u>X</u>   No <u>   </u>

[If you answered "yes" to question 1, proceed to question 2. If your answered "no" to question 1, you may stop here and inform the Marshal that you have reached a verdict.]

2.   Do you find by the preponderance of the evidence that all of the representations and warranties that The Barton Group made in the 2003 contract were true at the time the 2003 contract was entered into?

Yes <u>X</u>   No <u>   </u>

[If you answered "yes" to question 2, proceed to question 3. If your answered "no" to question 2, you may stop here and inform the Marshal that you have reached a verdict.]

3(a). Do you find by a preponderance of the evidence that The Barton Group performed all of its obligations under the 2003 Contract?

Yes _X_     No ___

3(b). Do you find by a preponderance of the evidence that The Barton Group was a procuring cause of NCR's sales agreement with McDonald's for RoL?

Yes _X_     No ___

[If you answered "yes" to both questions 3(a) and 3(b) or "yes" to either questions 3(a) or 3(b), proceed to question 4. If your answered "no" to questions 3(a) and 3(b), you may stop here and inform the Marshal that you have reached a verdict.]

4. Do you find by the preponderance of the evidence that NCR anticipatorily repudiated the 2003 contract?

Yes _X_     No ___

[If you answered "yes" to question 4, proceed to question 6. If you answered "no" to question 4, proceed to question 5.]

5. Do you find by the preponderance of the evidence that NCR breached the 2003 contract with The Barton Group by refusing to pay to The Barton Group 4% commissions on the RoL product?

Yes ___     No ___

[If you answered "yes" to question 5, proceed to question 6. If your answered "no" to question 5, you may stop here and inform the Marshal that you have reached a verdict.]

2

6.  If you answered "Yes" to questions 1, 2, 3(a) and/or 3(b), and 4, or "Yes" to questions 1, 2, 3(a) and/or 3(b), and 5, what amount of money would fairly and reasonably compensate The Barton Group for the damages caused by NCR's breach of contract with respect to NCR's refusal to pay 4% commissions to The Barton Group based on NCR's actual past sales to McDonald's of product(s) covered by the 2003 contract from April 2008 through August 31, 2010?

$ __518,667__

7.  If you answered "Yes" to questions 1, 2, 3(a) and/or 3(b), and 4, or "Yes" to questions 1, 2, 3(a) and/or 3(b), and 5, what amount of money would fairly and reasonably compensate The Barton Group for the damages caused by NCR's breach of contract with respect to NCR's sales to McDonald's of product(s) covered by the 2003 contract on and after September 1, 2010 in the United States?

$ __7,500,000__

[If you answered "yes" to Questions 1, 2, 3(a) and/or 3(b), and 4, or "yes" to Questions 1, 2, 3(a) and/or 3(b), and 5 above and completed Questions 6, and 7, you may stop here and inform the Marshal that you have reached a verdict.]

Signed _____
       (Foreperson)

Dated: December ___, 2010

3