UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

THE BARTON GROUP, INC.,                        :        **MEMORANDUM**
                                                         **OPINION AND ORDER**
                              Plaintiff,        :

                                                         08 Civ. 5679 (FM)
        - against -                             :

NCR CORPORATION,                                :

                              Defendant.        :

---------------------------------------------------------x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED: 06/24/2011           │
└─────────────────────────────────┘
```

**FRANK MAAS**, United States Magistrate Judge.

I.      Introduction

        Plaintiff The Barton Group, Inc. ("BGI") brought this breach of contract

action in an effort to recover past and future sales commissions under a contract that it

entered into in 2003 ("2003 Contract") with defendant NCR Corporation ("NCR").  The

2003 Contract required NCR to pay BGI a four percent sales commission with respect to

certain products sold by NCR to McDonald's Corporation ("McDonald's" or "McD").

The case was tried before a jury over the course of five days in December 2010.[1]  The key

issue at trial was whether an NCR product known as "Receipt on Label" ("RoL") was

subject to the 2003 Contract.  Following several hours of deliberations, the jury returned a

verdict in favor of BGI, finding that the 2003 Contract covered RoL.  The jury awarded

----

[1]        The trial was held before me after the parties consented to my exercise of
jurisdiction over this case for all purposes pursuant to 28 U.S.C. § 636(c).  (See ECF No. 36).

BGI damages in the amount of $8,018,667 for past and future sales commissions on

NCR's sales of RoL to McDonald's in the United States.

NCR has now moved for judgment as a matter of law ("JMOL") under Rule

50(b), or, in the alternative, a new trial under Rule 59, of the Federal Rules of Civil

Procedure.  (ECF No. 48).  In addition to opposing these motions, BGI seeks sales

commissions on NCR's future international sales of RoL to McDonald's.  Specifically,

BGI has moved for a declaratory judgment that NCR's obligation to pay BGI

commissions on future international sales of RoL to McDonald's under the 2003 Contract

remains "in full force and effect."  BGI further seeks an order of specific performance to

compel NCR to pay commissions in the future on any such international sales.  (ECF No.

51 at 1).

For the reasons set forth below, both motions are denied.

II.   Facts

Viewed in the light most favorable to BGI, the evidence at trial established

as follows:

A.   BGI's Relationship With McDonald's

BGI, through Lewis Barton ("Barton"), its sole owner and employee,

provides consulting services to fast-food restaurants, particularly in the area of food

packaging and food processing operations.  BGI's clients have included McDonald's and

Perseco, a company that undertakes purchasing for McDonald's.  Barton's relationship

with McDonald's dates back to the 1970s when he owned a company that supplied

ketchup packets to McDonald's restaurants.  Over the years, Barton has developed strong contacts with several different McDonald's departments.  (Tr. 55-58, 72).[2]

In the 1990s, Barton entered into a "handshake agreement" with McDonald's pursuant to which he could present new ideas to McDonald's for products or food preparation processes.  Such access to McDonald's was valuable because McDonald's did not accept unsolicited ideas from the general public.  Barton's involvement with several successful projects at McDonald's earned him a reputation as an innovator.  These projects typically arose in one of three ways.  First, Barton often generated his own ideas for cost-saving innovations by visiting and observing McDonald's franchises in operation.  At other times, McDonald's would invite Barton to develop a solution to a particular problem that it had identified.  Finally, third-party suppliers to McDonald's at times asked Barton to assist them with product development. (Id. at 62-68).

Despite its name, the handshake agreement between Barton and McDonald's was, in fact, reduced to writing several times, beginning in 1993.  (Id. at 68; see PX 1).[3]  These written agreements permitted Barton to have an audience with McDonald's managers but imposed no obligations on McDonald's.  McDonald's also had no obligation to purchase products from third-party suppliers that worked with Barton. (Tr. 68-69, 84).

---

[2]      "Tr." refers to the transcript of the trial.

[3]      "PX" refers to BGI's trial exhibits; "DX" refers to NCR's trial exhibits.

Since the 1990s, McDonald's has had a policy of shifting overhead costs, such as consultants' fees, to the supply chain.  This meant that McDonald's would not pay BGI directly for its work.  Instead, when Barton worked on projects involving third-party suppliers, McDonald's required that he be paid directly by the supplier.  (Id. at 75).  All of Barton's emails included a disclaimer explaining aspects of his relationship with McDonald's.[4]  (Id. at 85-86).

While the handshake agreement was in effect, Barton also entered into consulting arrangements with Perseco and specific departments within McDonald's.  Like the handshake agreement, the Perseco agreement gave Barton the ability to present Perseco with cost-saving ideas and products.  Perseco, however, paid Barton a stipend for his expenses.  (Id. at 73-74).  Similarly, in 2004, Barton entered into an oral consulting agreement with the McDonald's Innovation Center, which later was reduced to writing.  The Innovation Center develops and tests new products and food-preparation processes before they are used in McDonald's restaurants.  Under his agreement with the Innovation Center, Barton received a stipend to work on its projects.  (Id. at 76-77, 82; see PX 170).

---

[4]      That disclaimer stated:

> I am a consultant to McDonald's Corporation (McD) of Oak Brook, IL.  I have no right of agency from McD.  I can make no decisions that commit or obligate McD.  My function is recommendation only. I am not authorized to make any decisions on McD's behalf and McD cannot be obligated by anything I may do or say.  If you agree to supply any samples, this will not obligate either me or McDonald's Corporation in any way.

(See, e.g., PX 5, 33, 35).

B.      Automatic Sandwich Wrap Project

While he was providing consulting services to Perseco, Barton became
aware of an inefficiency regarding McDonald's existing sandwich wrappers.  At that
time, each McDonald's sandwich had its own unique wrapper which included the
sandwich's name.  As the McDonald's sandwich line expanded, it became difficult for the
food preparers to manage so many different wrappers.  Barton suggested installing a
printer in every restaurant that would permit the name of the sandwich to be printed, in
realtime, on a generic wrapper when the customer placed an order.  The generic wrapper,
which displayed only the McDonald's logo, would thus be used for every sandwich,
obviating the need for separate wrappers for each sandwich type.  This concept became
known as the "Automatic Sandwich Wrap Project" ("ASW Project").  Barton later
modified his proposal by suggesting that, in addition to the name of the sandwich, the
customer's special-order instructions[5] be printed on the wrapper.  (Tr. 87-89).

Perseco and the McDonald's engineering group responded positively to the
ASW Project and authorized Barton to continue working on it.  (Id. at 90).  The
engineering group became involved because of the need to place new printers in
McDonald's restaurants.  (See id.).  As a consequence, BGI and the McDonald's
engineering group entered into an oral agreement for the ASW Project independent of
BGI's other consulting agreements with McDonald's.  (Id. at 92-93).  McDonald's also

---

[5]      Special-order instructions refer to requests such as "extra pickles" or "no onions."
(Tr. 88).

directed Barton to work with NCR, a McDonald's supplier, to develop a printer for the ASW Project.[6]  Jean Lane ("Lane"), an NCR sales representative, became Barton's primary contact for the ASW Project.  (Id. at 93, 414).

On September 10, 2002, NCR and BGI entered into a contract concerning the ASW Project ("2002 Contract"), pursuant to which NCR appointed BGI as its "exclusive sales agent" with McDonald's for that project.[7]  (PX 12).  The 2002 Contract required that NCR pay BGI a five percent "business generation commission" on sales, licensing, and royalty fees arising out of the ASW Project.  (Id.).

Prior to signing the 2002 Contract, NCR had internal discussions about whether it was feasible for NCR to work with McDonald's on the ASW Project without having an agreement with BGI.  In an email to Lane and other NCR employees, Paul Samson ("Samson"), an in-house lawyer at NCR, explained BGI's position vis-a-vis McDonald's and its third-party vendors, such as NCR.  (PX 10).  Samson stated that

> Lew [Barton] does not have an exclusive arrangement with McD; that is, he cannot require on behalf of McD that NCR enter into this arrangement in order for NCR to do business with McD on this project or any other. . . . BGI will not represent our interests exclusively; it is dealing with all vendors and seeking fee agreements that, we are told, are substantially similar. . . . BGI is vendor agnostic and will be paid no matter which vendor wins the deal.

---

[6]     It was not unusual for McDonald's to direct Barton to work with a particular supplier on a project.  (Id. at 93).

[7]     "M. Anderson," NCR's vice president of global operations, signed the 2002 Contract on behalf of NCR.  (PX 12 at 3).

(Id. at 2).  In a reply email to Samson, Lane wrote that "McDonald's will not go around BGI and work directly with NCR on [the ASW Project,] and if [NCR] tried it would be seen as NCR being unethical in this deal."  (Id. at 1).  Lane stated further that McDonald's had expressed a "willingness to cover the additional 5%" cost related to BGI's commission.  (Id.).

The ASW Project eventually proved not to be commercially viable due to the high cost of acquiring the printer.  (Tr. 99).

C.     Sticky Label Project

1.     Development of the Sticky Label Project

After the ASW Project failed, Barton sought other alternatives that might enable McDonald's to avoid using preprinted sandwich wrappers.  One such proposal involved printing a label in realtime containing the sandwich name and any special-order instructions and attaching it to a generic wrapper.  This became known as the "Sticky Label Project."  (See id. at 99-102).

In addition to addressing the inefficiencies arising out of the use of preprinted sandwich wrappers, the Sticky Label Project solved a problem related to special-order sandwiches.  At that time, McDonald's utilized a cumbersome two-step process for preparing sandwiches with special-order instructions.  First, the customer's special-order instructions were printed on a piece of receipt paper known as a "grill slip."[8]

---

[8]     The special-order instructions therefore were sometimes referred to as "grill slip data" during the trial.  (See Tr. 117).

7

Second, after making the sandwich and wrapping it in a preprinted sandwich wrapper, the food preparer manually attached the grill slip to the wrapper with a round, red adhesive sticker bearing the McDonald's logo.  Barton's sticky label concept collapsed those two steps into a single operation.  Thus, both the customers' special-order instructions and the names of the sandwiches they had ordered would be printed on pressure-sensitive adhesive paper immediately after the orders were placed.  Because the labels had an adhesive backing, food preparers would be able to attach them directly to the sandwich wrapper, thereby eliminating the need to use a separate sticker.[9]  (Id. at 99-100).  The sticky labels also would allow McDonald's to wrap its sandwiches with generic wrappers instead of preprinted wrappers.  (See PX 33).

Barton began working with NCR on the Sticky Label Project in May 2003.  (Tr. 103).  In May and June 2003, Barton and NCR discussed how to incorporate the Sticky Label Project into the 2002 Contract, which related only to the ASW Project.  Samson, the NCR in-house lawyer, suggested that NCR and BGI enter into a new contract concerning the Sticky Label Project.  (Id. at 112-13).  To help frame their discussions, Barton sent Samson (and copied Lane on) an email containing a list of definitions relevant to the ASW and Sticky Label Projects.[10]  (Id. at 113; see PX 33).  The email informed Samson that, after Barton had proposed the sticky label idea to Lane,

_____

[9]      The sticky label was also referred to as the "sticky grill slip" or "sticky receipt" during the trial.  (See, e.g., id. at 104-05, 131).

[10]      The email bore the disclaimer that Barton included on all of his McDonald's-related emails.  (See PX 33).

Lane learned that McDonald's independently was exploring a similar idea.  Barton noted,

however, that McDonald's idea did "not fully cover [his] concept."  (PX 33).  Barton's

email requested confirmation from NCR that the Sticky Label Project was covered under

the 2002 Contract.[11]  (Id.).

        2.      2003 Contract

        In September 2003, NCR and BGI entered into the 2003 Contract, which

covered the ASW Project,[12] Sticky Label Project, and another new project, called the

"Alternative Project."  (PX 63).  The 2003 Contract defined the Sticky Label Project as

"an alternative to the ASW Project that uses a different technological approach comprised

of a print-on-demand pressure-sensitive label manually applied to a sandwich wrapper or

box that replaces a direct thermal receipt/pre-printed label application."  (Id. at 1).  The

"Alternative Project" involved "potentially converg[ing] the ASW and Sticky Label

Projects into an alternative project incorporating some or all elements of [the two

projects]."  (Id.).  Samson drafted this definition of the Alternative Project after he and

Barton discussed the possibility that there could be applications for the sticky labels that

were not subsumed within the definition of the Sticky Label Project.  Although the 2003

---

[11]     McDonald's previously had proposed printing a customer's special-order instructions and the McDonald's logo, but not the name of the sandwich, on a sticky label.  (PX 33).

[12]     The 2003 Contract defined the ASW Project as being "generally comprised of a printing solution addressing printing on a generic paper sandwich wrapper for low volume sandwiches sold by McD, using variable technology to print the name of the sandwich on the wrapper on an as-needed basis."  (PX 63 at 1).  The 2002 Contract did not include this definition.  (See PX 12).

Contract does not describe the Alternative Project as a "catch-all" provision, Barton testified that this was the purpose for its inclusion in the 2003 Contract.  (Tr. 120-21; <u>see id.</u> at 196, 249).

        The 2003 Contract appointed BGI as NCR's "exclusive sales agent" for the ASW, Sticky Label, and Alternative Projects with McDonald's, but reduced BGI's sales commission from five percent to four percent.  (PX 63 ¶¶ 1, 1.1, 6).  The 2003 Contract further stated that "[i]f NCR [was] awarded all or part of the ASW, Sticky Label, or Alternative Project at a time when BGI [was] serving as NCR's sales agent under [the 2003 Contract], this [Contract] shall automatically renew for additional 12 month terms until such time as NCR is no longer supplying any goods or services to McD on the ASW, Sticky Label, or Alternative Project."  (<u>Id.</u> ¶ 4).

        In the 2003 Contract, like the 2002 Contract, BGI made several representations and warranties.[13]  (<u>Id.</u> ¶ 2).  Among other things, BGI represented and warranted that "BGI has [a] sales agreement with [McDonald's] ('BGI-McD Agreement') for the ASW Project" and that "[t]he BGI-McD Agreement specifically authorizes BGI to enter into commission agreements, such as this [Contract], with proposed vendors."  (<u>Id.</u>).  BGI further represented and warranted that it had disclosed "it[s] proposed commission arrangements to [McDonald's]."  (<u>Id.</u>).

---

    [13]    The representations and warranties in the 2002 Contract were similar, but not identical, to those in the 2003 Contract.  (<u>See</u> PX 12 ¶ 2).

A choice-of-law provision in the 2003 Contract stated that its "interpretation and enforcement . . . shall be governed by the substantive law of the State of New York."  (Id. ¶ 11).

On September 3, 2003, one day before Barton signed the 2003 Contract, he emailed Samson and Lane, stating, "I want to be sure that we all understand one issue."[14] (PX 61; see Tr. 125).  With respect to that issue, BGI's warranty that it had a sales agreement with McDonald's, (see PX 63 ¶ 2), Barton explained,

> That agreement is not in writing.  That agreement has been expressed to me as their (MCD's) requirement for my compensation.  Jean Lane has been at a meeting (with Perseco) where that agreement has been discussed.  I want your assurance that you understand this:  i.e. that the "agreement" is not in writing and that your "agent" Jean Lane has been satisfied that such an agreement exists.

(PX 61).  The meeting to which Barton referred was held after BGI and Samson reached an agreement in principle with respect to BGI's compensation for the sticky labels.  (See Tr. 126).

A few minutes after Barton sent his email to Samson, Samson wrote a one-sentence reply, which stated, "Lew, this is holdover language from the earlier agreement." (PX 61).  Barton understood this to mean that the issue had been discussed "the last time around," and that Samson understood BGI's arrangement with McDonald's and found it acceptable.  (Tr. 126).

---

[14]     This email, too, bore Barton's customary disclaimer.  (PX 61).

3.      Presentation to Perseco and McDonald's

By September 2003, when BGI and NCR signed the 2003 Contract, Barton and Lane had introduced the sticky label concept to Perseco in July 2003.  (PX 50; Tr. 128-30).  Perseco reacted positively, encouraging Barton and NCR to continue working on the project.  (Tr. 130).  Thereafter, through his contacts at McDonald's, Barton arranged a meeting at the McDonald's Innovation Center.  (Id. at 133).  Barton targeted the Innovation Center because, as part of McDonald's global corporate umbrella, it developed products and processes that could be used in all of McDonald's domestic and international restaurants.  (Id. at 136; see id. at 77).  During the meeting with McDonald's Innovation Center personnel, Barton and Lane presented two versions of the sticky labels, one with a linered backing ("linered labels") and one without a liner ("linerless labels").  The Innovation Center liked the linerless labels and began to test them.  (Id. at 135-37, 150).  Barton attended the testing of the linerless labels, working closely with several Innovation Center employees; Lane also frequently attended meetings at the Innovation Center.  (Id. at 154-55).  Although NCR had a preexisting relationship with certain departments within McDonald's, (see id. at 414-15), Barton introduced Lane to several Innovation Center employees with whom she had not previously worked.  (Id. at 136).

The results of the sticky label tests at the Innovation Center were positive. McDonald's modified Barton's original idea, however, using preprinted wrappers to identify the sandwiches, such that, for certain types of sandwiches, the sticky label would list only the customer's special-order instructions.  McDonald's favored this approach

12

because it retained a sense of brand identity for its signature sandwiches, such as the Big Mac.  (Id. at 137).

       As a next step, McDonald's expanded the testing of the linerless sticky labels to a few McDonald's restaurants.  Barton was involved with the testing and served as a troubleshooter.  (Id. at 166, 168).  Following those tests, the Innovation Center requested that Lane create a business case for the Sticky Label Project.  At McDonald's, a "business case" was an internal document prepared using a template to help the company assess whether a particular product had an economic justification; it was an "essential step" in the product development process.  (Id. at 169-70).  McDonald's eventually approved the business case for the Sticky Label Project, which gave Barton and NCR the "green light" to move ahead.  (Id. at 173).

       In 2006, Barton presented the Sticky Label Project to owners and operators at McDonald's Worldwide Convention in Florida.  (Id. at 173-74).  This was a significant step in the development of the sticky labels because it meant that the McDonald's Innovation Center believed that the product was "ready to be exposed to [its] worldwide operators."  (Id. at 177).  Indeed, there was a "tremendous response" from the operators after Barton demonstrated the printer and labeling process.  (Id. at 175).

       Sometime in 2008, McDonald's gave final approval for the product to be rolled out in all of its restaurants.  (Id. at 179).

4.      Disclosure Regarding the 2003 Contract

At any "initial meeting" that Barton had with McDonald's concerning a particular project, he made it his practice to inform McDonald's of any compensation agreements that he had with third-party suppliers.  (Id. at 185-86).  In connection with the Sticky Label Project, Barton informed McDonald's in writing on several occasions that NCR had agreed to pay him sales commissions on sticky label sales.  (See id.; PX 79 (letter from Barton to John Hayes, Senior Director, McDonald's Corp., dated Dec. 11, 2003); PX 87 (email from Barton to Kenneth Koziol of the McDonald's Innovation Center, dated May 17, 2004, stating that BGI's "arrangement with NCR is a 4% commission on sales")).  NCR also understood that BGI had a relationship with McDonald's.  (See Tr. 416 (Lane understood that BGI's agreement with McDonald's allowed BGI to bring "people" to McDonald's, and that BGI would be compensated by those "people")).

5.      Other Applications for the Sticky Label Project

While the sticky labels were being tested at the Innovation Center, Barton realized that a smaller version of them could be used for applications other than sandwiches, such as the labeling of drive-through orders and special-order coffee drinks. (Id. at 152-53; see id. at 403).  Before Barton suggested these additional applications, McDonald's had been labeling coffee cups by hand with a grease pencil.  (Id. at 193).  After Barton informed Lane of the possible new applications, NCR tested the use of a narrower version of the sticky labels on coffee cups.  (Id. at 194-95; see PX 174).

14

Because the sticky labels were too wide for coffee cups, Mark Keeton ("Keeton"), an NCR engineer, used a belt sander to reduce the width of a roll of sticky labels, so that NCR and McDonald's could use them in the initial testing phases.  (Tr. 403-04).  When Barton inquired whether his newly-conceived coffee and drive-through applications for the sticky labels were covered under the 2003 Contract, Lane confirmed that they were. (Id. at 191-93, 197).

> D.     NCR's Commission Payments to BGI
>        and NCR's Termination of the 2003 Contract

In 2004 and 2005, during the testing phase of the Sticky Label Project, McDonald's made purchases of small quantities of sticky labels from NCR, for which BGI received commissions.  (Id. at 374-75; see PX 190).  According to Lane, NCR paid those commissions based on its "business decision" that the 2003 Contract covered the linerless sticky labels that NCR was selling to McDonald's.  (Tr. 487-88; see PX 113 (email from Lane to Keeton, dated Feb. 28, 2005, reflecting Lane's belief that Barton was "covered on linerless [labels]")).  Because the product was in a testing phase, the quantities involved, and therefore the payments, were small.  (Tr. 375).

Subsequently, "[i]n April 2007, NCR considered the possibility of terminating the [2003 Contract]."  (Id. at 201).  As the year progressed, Barton had difficulty getting updates from Lane about the status of the Sticky Label Project.  (Id. at 201-02).  Lane told Barton that the project was "at a standstill" because McDonald's had objected to the cost of the sticky labels.  (PX 222; Tr. 203-04).

15

At some point thereafter, Laura Wakefield ("Wakefield"), an NCR in-house attorney, contacted Barton to request a copy of the 2003 Contract because NCR did not have a copy.  (Tr. 204-05).  After Barton provided a copy, Wakefield asked him to give her the names of his contacts at McDonald's.  (Id. at 205; PX 260).  This made Barton "uncomfortable," especially because "all this information was already available at NCR." (Tr. 206).  As a consequence, Barton sent Wakefield an email dated February 4, 2008 (with a copy to Lane) suggesting that Wakefield speak to Lane about "this" because they had been working together on the project.  (PX 260).  Although Barton did not name any names, he explained in his email that his contacts at McDonald's were "at higher levels," and thus "no longer really involved in the day-to-day issues."  (Id.).

A few weeks later, on February 22, 2008, Daniel Bogan ("Bogan"), Senior Vice President and General Manager of NCR's Systemedia Division,[15] sent Barton a letter indicating that NCR would no longer pay BGI commissions pursuant to the 2003 Contract.  (PX 268).  Bogan stated that he had reached this decision because he was "unable to verify" certain of BGI's representations and warranties in the 2003 Contract. (Id.).  Specifically, Bogan "[had] not been able to find any evidence that [BGI had] a current relationship with McDonald's."  (Id.).  Bogan emphasized that Barton did not identify his contacts at McDonald's when Wakefield had requested that information. Furthermore, according to Bogan, Barton "did not produce a signed McDonald's

---

[15]     NCR's Systemedia Division was responsible for producing the sticky labels.  (Tr. 207).

agreement, although [Barton] stated that [he] had such an agreement."  (Id.).  Bogan

explained that future commission payments to BGI would be suspended "until [Barton

could] provide adequate evidence of the relationship with McDonald's."  (Id.).

       Barton responded with a letter of his own, in which he advised Bogan that

he had been associated with McDonald's for "over thirty years."  (PX 271).  Barton

further stated that he was "engaged with McDonald's via a consulting agreement of

[McDonald's] origination."  Barton claimed that he did not include a copy of that

agreement because he was not authorized to disclose it to a third party.  Barton indicated,

however, that he would ask McDonald's legal department "about this issue."  (Id.).  To

provide Bogan with more background about the Sticky Label Project, Barton also

attached to his letter a brief history of the project, in which he identified the McDonald's

employees with whom he had worked on the project.  Bogan did not follow up with any

of those employees.  (Tr. 653-54).

       In late March 2008, Barton reached out to Glenn Schackmuth

("Schackmuth"), McDonald's project manager for the Sticky Label Project, for help

rebutting Bogan's assertion that BGI did not have a consulting agreement with

McDonald's.  (Id. at 221-23; see Schackmuth Dep. 28).  Schackmuth then sent Barton an

email summarizing his conversation with Lane about the "commission recognition" that

BGI received from the suppliers it brought to McDonald's.  (PX 285).  In that email,

Schackmuth stated, "I clearly mentioned that while we [McDonald's] no longer pay you

[BGI] any fees, we continue to look at new opportunities with you — based on the supplier commission agreement."  (Id.).

  E.  <u>RoL</u>

    BGI did not receive any commission payments from NCR after 2008.  (Tr. 228).  Nevertheless, after terminating its relationship with BGI, NCR sold McDonald's a product called RoL.  (<u>Id.</u> at 522).  RoL is a continuous, linerless label that has spots of adhesive on its back, known as "spot coating."  (<u>Id.</u> at 366-67).  As of 2010, "roughly half" of McDonald's United States restaurants used RoL labels for sandwiches, while "a little more than half" used them for beverages.  (<u>Id.</u> at 338).

    After Bogan suspended BGI's commission payments, NCR lowered the price of RoL from $6 per unit to $5.88 per unit.  (<u>Id.</u> at 503-04).  At a $6 per unit price, NCR would have received only $5.76 ($6.00 - $0.24) per roll if it had paid BGI a four percent commission.  Thus, by refusing to pay BGI a commission, NCR was able to split the cost savings with McDonald's.

    A critical issue at trial was whether the sticky labels that Barton had been developing were the same product as RoL.  Lane testified in that regard that NCR began developing RoL without Barton's involvement after the McDonald's information technology group approached NCR about a label project.  (<u>Id.</u> at 420).  Keeton similarly testified that he and another NCR engineer "co-invented" RoL.[16]  (<u>Id.</u> at 365; <u>see also</u> id.

---

[16]  In 2009, NCR obtained a patent for RoL, which identified Keeton and the other engineer as the inventors.  (PX 308).  That patent expires in April 2026.  (Tr. 522).

at 374 (Keeton's testimony that he did not work with Barton on the development of RoL)).

       Other testimony indicated, however, that RoL and the sticky labels were the same product.  Perhaps not surprisingly, Barton testified that RoL was the same product as the sticky labels that he and NCR had presented to McDonald's Innovation Center in 2003.  (Id. at 227-28).  Keeton also conceded, however, that his description of the Sticky Label Project ("linerless product with patterned adhesive"), written a day before the parties signed the 2003 Contract, was identical to the description NCR later used for RoL. (Id. at 409; see PX 60).  Schackmuth, the McDonald's Sticky Label Project manager, explained that McDonald's had been exploring a label idea independently, but that it was "idle with limited activity" until the Innovation Center became involved with BGI's sticky labels.  (Schackmuth Dep. 107-08).

    F.    <u>Damages</u>

       The damages that BGI sought to recover as a result of NCR's repudiation of the 2003 Contract consisted of three components.  First, BGI contended that it was owed $518,667 in unpaid commissions for NCR's past sales of RoL to McDonald's for the period from April 1, 2008 to August 31, 2010.  (Tr. 533; see PX 355).  Second, BGI sought damages related to NCR's future sales of RoL to McDonald's international restaurants, which had only recently started to purchase RoL labels.  (Tr. 462).  Given the limited sales history, however, BGI's expert was unable to form a nonspeculative opinion

regarding those damages.[17]  BGI therefore requested a jury instruction which asked the

jurors to consider whether "the 2003 Contract remains in effect" and, if so, whether it

required "NCR to pay 4% commissions in the future relating to NCR's international sales,

if any, to McDonald's outside the United States on any product covered under either the

'Sticky Label Project' or the 'Alternative Project.'"  (See ECF No. 34 ("Joint Requests to

Charge") at 16; Tr. 462).  I denied that request, (Tr. 717-18), for reasons that are

explained below.

       Third, BGI contended that it was entitled to recover damages for future

commissions on NCR's sales of RoL to McDonald's restaurants in the United States.

BGI's damages expert, Dr. Phillip Beutel ("Dr. Beutel"), an economist, testified that these

damages could range from $1.3 million to $6.3 million and "in certain instances could

even be higher than those amounts."  (Id. at 531).  Dr. Beutel's damages calculations

reflected NCR's projected RoL sales for both the sandwich and beverage applications and

were based on NCR's historical sales figures as well as several assumptions.  (Id. at 545;

see PX 362-65).  The assumptions related to future RoL manufacturing costs and price

increases, the volume of RoL sales to McDonald's restaurants, the number of

McDonald's restaurants using RoL, and overall growth in the number of McDonald's

restaurants.  (Tr. 547, 560, 563-66).  Because these variables affected the projected future

usage rate of RoL in McDonald's restaurants, Dr. Beutel presented both a "low-end" and

---

[17]     The Court therefore sustained NCR's objections to any testimony by BGI's expert
regarding projected future international sales of RoL.  (Tr. 568, 572).

"high-end" forecast of RoL sales.  (Id. at 542-43, 555-56).  Finally, Dr. Beutel applied a discount rate of 11.3 percent, which was equal to NCR's weighted average cost of capital, to calculate the net present value of the damages attributable to future domestic RoL sales.  (Id. at 548-50).

Significantly, Dr. Beutel did not offer an opinion with respect to the number of years that McDonald's would be likely to continue purchasing RoL, which he also referred to as the "forecast horizon."  He estimated BGI's damages through 2025, a date that coincided with the expiration of NCR's patent for RoL, (see id. at 546), but emphasized that the appropriate forecast horizon was a jury question.[18]  (Id. at 555-56).  Dr. Beutel similarly did not offer an expert opinion as to the RoL usage rate that the jury should apply as part of its damages calculation.  (Id. at 543).

NCR's damages expert, Laura Stamm ("Stamm"), was an accountant and consultant.  (Id. at 679-80).  Stamm testified that Dr. Beutel's projections were "optimistic" for several reasons.  (Id. at 690).  First, according to Stamm, it was unreasonable to assume that NCR would continue as McDonald's sole supplier of RoL through 2025 in light of McDonald's preference for maintaining multiple suppliers.  (Id. at 688-89).  Stamm's damages calculations consequently assumed that, by 2012, NCR's market share would be reduced from 100 percent to 60 percent.  (Id. at 696; DX AN).

---

[18]      Dr. Beutel nevertheless noted that "there [was] a reasonable basis for thinking that perhaps NCR would be able to continue selling [RoL] to McDonald's at least through the end of the patent expiration and perhaps beyond that."  (Id. at 546).

Stamm also questioned Dr. Beutel's assumptions with respect to McDonald's likely growth, the RoL usage rate at McDonald's restaurants, and the discount rate.  (Tr. 691-94).  Because RoL was used primarily for special-order sandwiches, Stamm reasoned that NCR's RoL sales might not increase even if the McDonald's restaurants experienced overall sales growth in the future.  (Id. at 691).  Stamm's damages calculations therefore reflected a lower usage rate than Dr. Beutel's high-end forecast.  (Id. at 696-97).  Stamm's testimony was similar to Dr. Beutel's, however, in that she did not opine as to the appropriate forecast horizon.  (Id. at 698).  She nonetheless testified that a forecast horizon through 2025 "just seem[ed] way too long."  (Id.).

Although Stamm agreed that Dr. Beutel's 11.3-percent discount rate was an appropriate "starting point," she concluded that a discount rate specific to NCR's paper and label business should be applied.  Because RoL was a new product, Stamm believed that a higher discount rate should be used to account for the risks associated with a new business.  (Id. at 692-93).  She therefore applied a discount rate of twenty percent.  (Id. at 693).

G.    Jury Instructions and Verdict

The sole claim presented for the jury's consideration was a breach of contract claim.  In that regard, the jury was instructed that BGI bore the burden of establishing "every essential element of its claim[] by a preponderance of the evidence."  (Id. at 761, 767).  Over NCR's objection, (see id. at 720-21), the jury was further

22

instructed that NCR had the burden of proving its defense that BGI breached the

representations and warranties in the 2003 Contract by a preponderance of the evidence.

(Id. at 769-70).  With respect to damages, the jury was instructed that if it determined that

NCR breached the 2003 Contract, it must award BGI "sufficient damages to compensate

it for any loss proximately caused by NCR's breach."  (Id. at 772).  The Court cautioned

the jury that such damages cannot be awarded for speculative losses, but, rather, only for

losses that BGI "actually has suffered or which it is reasonably likely to suffer in the

future."  (Id. at 772-73).

   The Court's charge also explained the general principles of contract

interpretation applicable to the case.  Thus, the jury was directed first to consider the

"plain and ordinary meaning of the words used" in interpreting the 2003 Contract.  (Id. at

768).  The jury was further instructed that if that inquiry was unavailing, the Contract had

to be interpreted "in accordance with the intent of the parties in the making of the

contract."  (Id. at 768).

   Finally, with respect to BGI's undertakings in the 2003 Contract, the jury

was instructed that (a) a sales agent must be a "procuring cause of the sale" to be entitled

to a sales commission; and (b) an agent must be "a direct and proximate link to the sale or

. . . the efficient cause of the sale rather than being an indirect or remote link to the sale."

(Id. at 771).

   After several hours of deliberation over the course of one afternoon, the

jury returned a verdict in which it found that NCR had breached the 2003 Contract, and

that BGI suffered damages in the amount of $8,018,667.  (Id. at 873).  This award

consisted of $518,667 attributable to BGI's lost commissions between April 1, 2008 and

August 31, 2010, and an additional $7.5 million to compensate BGI for its lost

commissions on NCR's sales of RoL to McDonald's in the United States on or after

September 1, 2010.  (See id.).

   In arriving at these damages, the jury responded to a verdict sheet, on which

it indicated that BGI had established by a preponderance of the evidence that (a) the 2003

Contract covered RoL; (b) all of the representations and warranties that BGI made in the

2003 Contract were true at the time the parties entered into the 2003 Contract; (c) BGI

performed all of its obligations under the 2003 Contract; (d) BGI was a procuring cause

of NCR's sales agreement with McDonald's for RoL; and (e) NCR had anticipatorily

repudiated the 2003 Contract.  (Id. at 873-76).

   Immediately after the Court discharged the jury, NCR orally renewed its

JMOL motion and moved, in the alternative, for a new trial.  (Id. at 877; see also id. at

619-20, 715, 756).  NCR subsequently submitted papers in support of those motions,

(ECF Nos. 49, 59), and BGI cross-moved for a declaratory judgment that the 2003

Contract remains in full force and effect with respect to NCR's obligation to pay BGI

commissions on future international sales of RoL, and for an order requiring NCR to

specifically perform that aspect of the 2003 Contract (ECF Nos. 51-53, 60).  Each of

those motions is now fully submitted.

III.     Discussion

     A.     NCR's Motions

          1.     Rule 50

In its renewed JMOL motion pursuant to Rule 50(b), NCR contends that the trial record does not support the jury's verdict in favor of BGI.  Specifically, NCR maintains that the evidence presented at trial established that (a) BGI breached two representations and warranties in the 2003 Contract, (b) the 2003 Contract did not cover RoL, (c) BGI did not procure NCR's sales of RoL to McDonald's, (d) the 2003 Contract did not cover sales of RoL applicable to the beverage application, and (e) the future damages awarded to BGI were based on improper speculation.  (ECF No. 49 ("Def.'s Mem.") at 1).

Rule 50(b) of the Federal Rules of Civil Procedure provides that a party may renew a JMOL motion after trial, provided that the motion also was made pursuant to Rule 50(a) before the case was submitted to the jury.  Fed. R. Civ. P. 50(b).  Rule 50(a), in turn, requires that such a motion specify the judgment sought and the law and the facts that establish that the moving party is entitled to judgment.  Fed. R. Civ. P. 50(a).

Trial and appellate courts apply the same standard in reviewing a post-trial JMOL motion.  DiSanto v. McGraw-Hill, Inc./Platt's Div., 220 F.3d 61, 64 (2d Cir. 2000).  Pursuant to that standard, a movant seeking to set aside a jury verdict faces a

"high bar." <u>Lavin-McEleney v. Marist Coll.</u>, 239 F.3d 476, 479 (2d Cir. 2001).  As the

Second Circuit has cautioned:

> In deciding such a motion, the court must give deference to all
> credibility determinations and reasonable inferences of the jury,
> and it may not itself weigh the credibility of witnesses or
> consider the weight of the evidence.  Thus, judgment as a matter
> of law should not be granted unless (1) there is such a complete
> absence of evidence supporting the verdict that the jury's
> findings could only have been the result of sheer surmise and
> conjecture, or (2) there is such an overwhelming amount of
> evidence in favor of the movant that reasonable and fair minded
> [persons] could not arrive at a verdict against [it].

<u>DiSanto</u>, 220 F.3d at 64 (quoting <u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136

F.3d 276, 289 (2d Cir. 1998)); <u>accord</u> <u>Yurman Design, Inc. v. PAJ, Inc.</u>, 262 F.3d 101,

108 (2d Cir. 2001).

> a.      <u>BGI's Representations and Warranties</u>

NCR contends that, contrary to the jury's verdict, the evidence at trial

established that BGI breached the representations and warranties in the 2003 Contract by

falsely representing and warranting that (i) BGI had a "sales agreement" with

McDonald's for the ASW Project and (ii) BGI had disclosed the proposed BGI-NCR

commission arrangements to McDonald's.  (Def.'s Mem. at 2 (citing PX 63 ¶ 2)).

> i.      <u>BGI's Sales Agreement With McDonald's</u>

NCR's contention regarding the first allegedly breached representation and

warranty is premised on the notion that a "sales agreement" must impose an affirmative

obligation.  NCR asserts that, because the BGI-McDonald's handshake agreement

imposed no obligation on McDonald's, it was not a "sales agreement" under any

26

reasonable construction of that term, and that BGI's representation and warranty therefore was false.  (Def.'s Mem. at 7).

The 2003 Contract did not define the term "sales agreement."  The meaning of the term "sales agreement" in the 2003 Contract therefore presented a question of fact for the jury to decide.  See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 158 (2d Cir. 2000) ("generally interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder").  The jury was instructed, in that connection, to determine the meaning of language in the 2003 Contract according to the "the plain and ordinary meaning of the words."  (Tr. 768).  Recognizing, however, that this may not always illuminate what a contract requires, the jury was instructed that, if that approach failed, it should "decide the appropriate meaning of [the 2003 Contract's] terms" by considering the intent of the parties and the circumstances surrounding the Contract's formation.  (Id. at 768-69). Here, it is clear that the jury could reasonably apply these principles to find that BGI had a sales agreement with McDonald's related to the ASW project.

While many of BGI's arrangements with McDonald's were rather informal, Barton testified at trial about a so-called "handshake agreement" pursuant to which BGI could present ideas to McDonald's.  Indeed, BGI had entered into several such agreements with different departments at McDonald's, including an oral agreement with the McDonald's engineering group relating specifically to the ASW Project.  (Id. at 76-77, 92-93).  Despite the number of handshake agreements, Barton's uncontradicted

testimony established that their key terms were the same:  (a) BGI could present new ideas to, but lacked the power to bind, McDonald's; and (b) McDonald's had no obligations to BGI or the suppliers with which BGI worked.  (Id. at 62, 84).  At some point, McDonald's also began to insist that BGI secure its compensation from any suppliers that Barton successfully introduced.  (Id. at 75).

The suggestion that this did not constitute an adequate sales agreement is belied by NCR's own conduct while it was negotiating the 2002 and 2003 Contracts.  For example, in internal NCR email correspondence less than one month before the parties signed the 2002 Contract, Samson set forth his understanding of BGI's relationship with McDonald's, using language which was consistent with the terms of BGI's handshake agreement.  (See PX 10 (explaining that BGI cannot bind McDonald's)).  Additionally, before the 2003 Contract was signed, Barton emailed Samson to ensure that Samson had no objection to the nature of BGI's "agreement" with McDonald's, which Barton characterized as an oral agreement concerning his "compensation."  (PX 61).  In his reply email, Samson did not suggest that BGI's arrangement with McDonald's did not constitute a proper "sales agreement."  (Id.).  Indeed, he characterized the requirement of a sales agreement as "holdover language from the earlier [2002] agreement."  (Id.).

In sum, there was ample evidence from which the jury could conclude that NCR and BGI intended that the term "sales agreement" refer to the handshake agreements between BGI and McDonald's, and that NCR did not interpret that term in the 2003 Contract to require that McDonald's undertake some affirmative commitment

28

beyond listening to BGI's ideas.  Moreover, Barton's uncontradicted testimony

established that the handshake agreements were still in effect when the parties signed the

2003 Contract.  (Tr. 81; see also id. at 218 (stating that BGI had two "handshake

agreements" as of July 14, 2004)).[19]  NCR therefore is not entitled to judgment as a matter

of law on its claim that BGI breached its representation and warranty regarding the

existence of a sales agreement between BGI and McDonald's.

                ii.      BGI's Disclosure of
                          Commission Arrangement to McDonald's

The second disputed representation and warranty was that BGI had

"disclosed it[s] proposed commission arrangements to McD."  (PX 63 ¶ 2).  NCR

contends that BGI's disclosures to McDonald's regarding the Sticky Label Project did not

satisfy this warranty because (a) BGI's disclosures prior to the signing of the 2003

Contract were too general, and (b) its disclosures after the signing of the 2003 Contract

were untimely.  (Def.'s Mem. at 4-5; ECF No. 59 ("Def.'s Reply Mem.") at 2-3).

At the outset, the parties dispute whether BGI's warranty required that it

disclose to McDonald's its commissions only on the ASW Project, or whether the

disclosure requirement extended to the Sticky Label Project.  Although NCR suggests

that the warranty also applied to the Sticky Label Project, (see Def.'s Mem. at 5), BGI

maintains that the warranty was limited to the ASW Project because the first sentence of

---

[19]     Indeed, Barton testified at trial that he currently was working on several projects with McDonald's for which he was being paid through commission arrangements with third-party suppliers.  (Tr. 80-81).

Paragraph 2 of the 2003 Contract, in which BGI's warranties are listed, refers only to that Project.  (ECF No. 56 ("Pl.'s Opp'n Mem.") at 7).  There is no need to resolve this issue because there was ample evidence from which the jury could conclude that BGI's representation and warranty was true with respect to both the ASW and Sticky Label Projects when the parties entered into the 2003 Contract.

Specifically, Barton testified that McDonald's required BGI to enter into commission arrangements with third-party suppliers as part of its program of shifting its overhead costs to the "supply chain."  (Tr. 75).  Because McDonald's told Barton that any compensation that BGI earned must come directly from third-party suppliers, (see id.), it was reasonable for the jury to infer that McDonald's knew that BGI was being compensated by those suppliers.  It further was reasonable for the jury to conclude that McDonald's knew that NCR was paying BGI in connection with both the ASW Project and related projects because it was McDonald's that had directed BGI to work with NCR in the first place.  (See id. at 93).

Barton also testified that he disclosed his commission arrangements to McDonald's whenever he began working with a supplier on a particular project.  (See id. at 185-86 ("it was important that I make it clear where my compensation was coming on this particular project")).  Consistent with this practice, when Barton initially presented the ASW Project to McDonald's, he informed its personnel that NCR was compensating BGI so that "there was no surprise."  (Id. at 186).  Indeed, as of August 2002, before BGI and NCR signed the 2002 Contract, McDonald's was aware that NCR was paying BGI a

five percent commission in connection with the ASW Project.  (See PX 10).  Barton

testified that he made similar disclosures to McDonald's regarding his contract with NCR

for the Sticky Label Project.  (See Tr. 185).  There consequently was sufficient evidence

to support the jury's conclusion that McDonald's knew about the BGI-NCR commission

arrangement.

        NCR contends that these disclosures were inadequate because the warranty

required that BGI disclose to McDonald's "the essential terms of [BGI's] arrangements"

with NCR.  (Def.'s Reply Mem. at 2).  In advancing this argument, NCR once again

attempts to read into the 2003 Contract requirements that the Contract itself does not

contain.  The warranty does not define "commission arrangements;" it thus is arguable

whether the warranty required that BGI disclose to McDonald's "the essential terms" of

the BGI-NCR commission agreement, or merely that there was a commission agreement

between the parties.  Given this ambiguity, the meaning of the term "commission

arrangements" was properly for the jury to decide.  See Compagnie Financiere, 232 F.3d

at 158.

        Based on the parties' conduct, the jury reasonably could conclude that

BGI's disclosures to McDonald's prior to the signing of the 2003 Contract satisfied the

requirement that the "proposed commission arrangements" be disclosed.  For example,

Lane accompanied Barton to meetings with McDonald's during which Barton disclosed

the BGI-NCR commission arrangement.  (Tr. 185-86; see also id. at 92).  Despite her

presence, Lane never alleged that those disclosures fell short of the 2003 Contract's

requirements.  Nor did Lane or Samson raise any concerns about the sufficiency of BGI's

disclosures or suggest that they had a different understanding of the scope of the warranty

while the parties were negotiating the 2003 Contract.  Thus, the circumstances

surrounding BGI's disclosures support the inference that the term "proposed commission

arrangements," as used in the warranty, required no greater disclosure than that which had

actually been made by Barton on behalf of BGI as of the date the 2003 Contract was

signed.

        NCR also contends that BGI did not inform McDonald's about its

commission arrangements until after the 2003 Contract was signed.  (Def.'s Mem. at 4-5).

In support of this assertion, NCR points to two communications from BGI to

McDonald's.  First, in December 2003, three months after BGI and NCR entered into the

2003 Contract, Barton wrote to John Hayes ("Hayes"), a senior director at McDonald's,

to provide him with a status report of BGI's current projects with McDonald's, including

the Sticky Label Project.  (PX 79).  Barton's letter indicated that, in light of McDonald's

recent decision not to pay BGI directly, BGI had developed sales commission agreements

with the suppliers on his projects.  (Id.).  Second, approximately eight months after the

2003 Contract was signed, Kenneth Koziol, of McDonald's Innovation Center, sent

Barton an email regarding the progress of the Sticky Label Project.  (PX 87).  In that

email, Koziol inquired about BGI's fee for the sticky labels, stating, "I'm not aware of

your deal on the labels . . . . If you don't get a fair shake on the thing, let me know."  (Id.).

In his reply, Barton advised Koziol that his "arrangement with NCR is a 4% commission on sales."  (Id.).

Barton's communications with Hayes and Koziol hardly compel the conclusion that McDonald's previously was unaware of BGI's "proposed commission arrangements" with NCR.  Indeed, Hayes and Koziol were just two of the many people at McDonald's whom Barton knew.  (See Tr. 181-82).  It certainly would have been reasonable for the jury to conclude that other McDonald's employees, such as Schackmuth, who managed the Sticky Label Project and attended numerous meetings with Barton, were fully aware of BGI's commission arrangement with NCR before the 2003 Contract was signed.  (See Schackmuth Dep. 105 (testifying that "there was an understanding" and "acceptance [by McDonald's]" that BGI "would be paid a commission, if at all, by the supplier")).

To be sure, the jury could have adopted the conclusion that Barton's correspondence with Hayes and Koziol confirmed that BGI's efforts to comply with its warranty were untimely.  However, the jury also could reasonably have concluded, based on the evidence set forth above, that McDonald's already knew at least the contours, if not the details, of BGI's commission arrangement with NCR when the parties entered into the 2003 Contract.  As the verdict confirms, (see Tr. 874), the jury reached the second conclusion — finding that BGI's representation and warranty was true as of the date that the parties signed the 2003 Contract.  Since this determination is supported by the evidence, NCR is not entitled to judgment as a matter of law on its claim that BGI

breached a representation and warranty in the 2003 Contract by failing to disclose to McDonald's its proposed commission arrangement with NCR.

> b.   Scope of the 2003 Contract

Whether the 2003 Contract covered RoL was another key question presented to the jury, which concluded that "either or both of the terms 'Sticky Label Project' and 'Alternative Project' . . . cover[ed] the RoL product that NCR sells to McDonald's."  (See id. at 873-74).  NCR now contends that judgment as a matter of law nevertheless is warranted because the 2003 Contract "unambiguously" does not cover RoL.  (Def.'s Mem. at 10).  The definitions of the Sticky Label and Alternative Projects, however, were not unambiguous on their face.  Accordingly, the meaning of those terms was properly left to the jury to determine.  See Compagnie Financiere, 232 F.3d at 158. Indeed, had these terms been as unambiguous as NCR contends, there would have been no need for a trial on the issue of liability.  See Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992) ("contract's proper construction" may be determined as a matter of law when its "words convey a definite and precise meaning absent any ambiguity").

> i.   Sticky Label Project

The 2003 Contract defined the Sticky Label Project as "an alternative to the ASW Project that uses a different technological approach comprised of a print-on-demand pressure-sensitive label manually applied to a sandwich wrapper or box that replaces a direct thermal receipt/pre-printed label application."  (PX 63 at 1).  The 2003

Contract further defined the ASW Project as being "generally comprised of a printing solution addressing printing on a generic paper sandwich wrapper for low volume sandwiches sold by McD, using variable technology to print the name of the sandwich on the wrapper on an as-needed basis."  (Id.).

Because the definition of the Sticky Label Project referred to it as an alternative to the ASW Project using a different technological approach, NCR argues that the Sticky Label Project necessarily was limited by the scope of the ASW Project. According to NCR's reasoning, the Sticky Label Project thus encompassed only "a generic sandwich wrapper with the name of the sandwich printed on the label."  (Def.'s Mem. at 11).  Because McDonald's eventually decided not to print sandwich names on RoL labels — instead, printing only special-order instructions, (see Tr. 137), — NCR claims that RoL does not fit within the definition of the Sticky Label Project.  (Def.'s Mem. at 12).

The language of the 2003 Contract in fact supports a broader interpretation of the Sticky Label Project than that advanced by NCR.  NCR's interpretation of the Sticky Label Project hinges on an extremely strict reading of the ASW Project definition. Prefacing the definition of the ASW Project, however, is the word "generally," which suggests that the "printing solution" described therein was not the sole printing method that could be employed as part of the ASW Project.  Indeed, Barton testified that the printing solution in the ASW Project's definition was simply an "example" of a printing method covered by the ASW Project.  (Tr. 237-38).  Because the Sticky Label Project

was an "alternative to the ASW Project," the jury could reasonably conclude that the Sticky Label Project similarly was not limited to generic wraps with sandwich names printed on the labels.

The evidence also showed that McDonald's used the RoL labels purchased from NCR in a manner consistent with the objective of the Sticky Label Project, which was to use "a print-on-demand pressure-sensitive label . . . that replace[d] a direct thermal receipt/pre-printed label application." (PX 63 at 1). Indeed, McDonald's personnel used the terms RoL and sticky label interchangeably. (Tr. 486-87). This is not surprising since, as Barton explained, the purpose of the Sticky Label Project was to replace the cumbersome two-step procedure of printing a grill slip on receipt paper (which had no adhesive) and attaching it to the sandwich with a red sticker. (See id. at 99-100). The RoL labels similarly enabled McDonald's restaurants to label special-order sandwiches without using the two-step procedure. (Id. at 338; see also id. at 225).

Additionally, NCR's conduct during the testing phase of the Sticky Label Project belies its claim that the 2003 Contract did not cover the labels that NCR was developing. Thus, Lane acknowledged in an email to Keeton, an NCR engineer, that she believed that Barton was "covered on linerless [labels]." (PX 113 ). Lane also informed McDonald's "[a]t some point in time" that the sticky labels NCR was developing fell within the 2003 Contract. (Tr. 489). Perhaps most tellingly, NCR paid BGI commissions on sticky labels sold to McDonald's during the testing phase. (Id. at 341, 374-75, 487). Although NCR attempted to minimize the significance of these payments, (see id. at 375-

36

77 (Keeton's testimony that NCR paid BGI in part because those payments were small),

487 (Lane's testimony that, in 2004 and 2005, NCR reached a "business decision" to pay

BGI)), the jury reasonably could have inferred that NCR in fact made these payments

because it believed that the 2003 Contract covered RoL.

Finally, Keeton, one of the inventors named on the RoL patent, conceded

that both RoL and the Sticky Label Project involved a "linerless product with patterned

adhesive."  (Id. at 409-10; PX 60).

From this evidence, the jury could reasonably conclude that the definition

of the Sticky Label Project was expansive enough to cover RoL.  Judgment as a matter of

law therefore must be denied with respect to NCR's claim that the Sticky Label Project,

as defined in the 2003 Contract, did not apply to RoL.

ii.    <u>Alternative Project</u>

The 2003 Contract defined the Alternative Project as "an effort to

potentially converge the ASW and Sticky Label Projects into an alternative project

incorporating some or all elements of the ASW and Sticky Label Projects."  (PX 63 at 1).

This definition of the term "Alternative Project" could encompass a wide range of

products since it does not identify which elements of the other projects must be

incorporated into the Alternative Project.  The broad language that the parties used in the

2003 Contract to describe the Alternative Project thus is consistent with Barton's

testimony that BGI and NCR both intended that the term Alternative Project serve as a

"catch-all phrase to cover" other potential applications for the sticky labels.  (Tr. 120-21).

Significantly, although Samson, NCR's in-house attorney, drafted the Alternative Project definition after discussions with Barton, NCR did not present any testimony refuting Barton's testimony concerning the intended breadth of the Alternative Project's definition.  It therefore was reasonable for the jury to credit Barton's testimony on that subject.

NCR contends that the Alternative Project, having resulted from a "convergence" of the ASW and Sticky Label Projects, necessarily must involve "generic wrapping paper and printing the name of all sandwiches or, at a minimum, all low volume sandwiches."  (Def.'s Mem. at 14).  The 2003 Contract was silent, however, as to which aspects of the ASW and Sticky Label Projects had to be converged into the Alternative Project.  Indeed, the contract language drafted by Samson on behalf of NCR requires that the Alternative Project include "some or all elements of the ASW and Sticky Label Projects."  (PX 63 at 1) (emphasis added).  As noted above, there was ample evidence that RoL fell within the definition of the Sticky Label Project.  If so, RoL obviously must have at least some of the elements of the Sticky Label Project.  RoL also plainly incorporated some elements of the ASW Project since the RoL labels were used to identify sandwiches.

As a consequence, it was reasonable for the jury to conclude that the definitions of either, or both, the Sticky Label and Alternative Projects covered RoL. NCR's JMOL motion therefore must be denied insofar as it is based on a claim that the 2003 Contract did not apply to RoL.

c.      Procuring Cause of
        NCR's Sales of RoL to McDonald's

Whether BGI was a procuring cause of NCR's sales of RoL to McDonald's

also was a question of fact for the jury.  See Fieger v. Pitney Bowes Credit Corp., 251

F.3d 386, 403 (2d Cir. 2001) (whether plaintiff was "a procuring cause entitled to a

commission" is a "question[] of fact to be determined by a factfinder").  The jury was

instructed in that regard that BGI had to have been a procuring cause of the sale between

NCR and McDonald's to be entitled to sales commissions.  (Tr. 771).  As the Court

explained in its charge, this required a showing that BGI was a "direct and proximate link

to the sale or . . . the efficient cause of the sale."  (Id.).  The jury was cautioned, however,

that a "sales agent is not required to participate in all stages of the negotiation or to be

present when an agreement finally is made" but that "merely introducing the contracting

parties is not enough."  (Id.).  These instructions accurately stated the applicable law.  See

Argo Marine Sys., Inc. v. Camar Corp., 755 F.2d 1006, 1011 (2d Cir. 1985) (noting that

an "indirect and remote" link to the sale is insufficient to satisfy the procuring-cause

requirement) (citing Greene v. Hellman, 51 N.Y.2d 197, 206 (1980)); R.B. Williams

Holding Corp. v. Ameron Int'l Corp., No. 97 Civ. 0679E (SR), 2001 WL 266026, at *12

(W.D.N.Y. Mar. 12, 2001) (a sales agent who did not "participate in the negotiations . . .

must at least show that he created an amicable atmosphere in which negotiations went

forward or that he generated a chain of circumstances which proximately led to the sale").

The jury could reasonably have concluded, based on the testimony and

evidence, that Barton was instrumental in the development and testing of sticky labels

that NCR later marketed as RoL.  Indeed, NCR and BGI first presented the sticky label

concept to McDonald's after Barton used his contacts there to set up a meeting in 2003.

(See Tr. 133, 136).  Barton also shepherded the Sticky Label Project through the many

testing steps that were necessary before McDonald's approved the project for

implementation.  During this phase of his work on behalf of NCR, Barton worked closely

with several McDonald's Innovation Center managers, attended the tests, and provided

troubleshooting advice.  (Id. at 154-55, 166, 168).  Barton also raised interest in the sticky

labels among McDonald's owners and operators — a key step in the McDonald's

approval process — by demonstrating the labels to them at the McDonald's Worldwide

Convention in 2006.  (Id. at 173-74).

> Although NCR had worked with McDonald's previously, (see id. at 414-
15), Barton had strong relationships with certain departments to which NCR had not

previously had access, including the Innovation Center.  (See id. at 136).  Moreover,

while certain departments within McDonald's were independently exploring the idea of a

sticky label before NCR entered into the 2003 Contract with BGI, that project was "idle"

and had "limited activity" before Barton made his presentation to the Innovation Center.

(Schackmuth Dep. 107-08).  The introductions that Barton made between NCR and

Innovation Center personnel therefore were important for the progress of the Sticky Label

Project.

> NCR is, of course, correct that BGI did not directly cause McDonald's to
purchase RoL in commercial quantities since BGI was no longer involved with the sticky

labels when McDonald's approved their use in its restaurants.  (See Def.'s Reply Mem. at 8).  To earn its commission, however, BGI need have only "generated a chain of circumstances which proximately led to the sale."  R.B. Williams Holding Corp., 2001 WL 266026, at *12.  Here, there was ample evidence that BGI's involvement in the Sticky Label Project, which included participation in the extensive testing conducted by the McDonald's Innovation Center and the demonstration of the labels to McDonald's owners and operators, was critical to McDonald's eventual approval of the sticky labels. The jury therefore could reasonably conclude that these activities were a proximate cause of NCR's sales of RoL to McDonald's.  This is all that BGI was required to show to establish its entitlement to a sales commission.

Judgment as a matter of law therefore must be denied with respect to NCR's claim that BGI was not the procuring cause of NCR's RoL sales to McDonald's.

### d.    Sales of RoL for the Beverage Application

NCR further contends that BGI was not entitled to damages for sales of RoL related to beverage or coffee applications because those applications did not fall within the definition of the Alternative Project under 2003 Contract.  (Def.'s Mem. at 18- 19).  Despite NCR's claim that the Alternative Project covered only labels on sandwiches, (see id. at 14), there was evidence at trial from which the jury could conclude that the 2003 Contract did not exclude non-sandwich applications for the labels.

During the testing phase of the Sticky Label Project, Barton suggested that McDonald's use the sticky labels for its new line of coffee drinks.  (Tr. 193-94).  As a

result, NCR tested the sticky labels on coffee cups.  (Id. at 197-98).  Barton testified that

when he and Lane discussed whether the 2003 Contract included this beverage

application, Lane confirmed that it was within its scope.  (Id. at 197).  Indeed, NCR did

not really dispute that these conversations occurred.

The evidence further showed that Lane, who was NCR's principal liaison

with Barton, did not believe that BGI's commissions were confined to the sale of labels

for sandwich applications.  Thus, Barton testified that after McDonald's began testing the

labels for drive-through orders, Lane told him that the 2003 Contract covered the drive-

through application.  (Id. at 192-93; see PX 144).  Based on Lane's understanding that the

2003 Contract covered sales of labels used to identify drive-through orders — a non-

sandwich application — the jury certainly could infer that the 2003 Contract was not

strictly limited to sandwich applications.  If so, contrary to NCR's claim, the 2003

Contract extended to sales commissions on the beverage application.

Finally, as discussed above, the language of the 2003 Contract supports a

broader interpretation of the term "Alternative Project" than that advanced by NCR.

Because the 2003 Contract stated that the Alternative Project incorporated "some or all

elements of the ASW and Sticky Label Projects," (PX 63 at 1), without identifying those

elements, it is reasonable to conclude that the Alternative Project was not confined solely

to sandwich applications.  The beverage application clearly incorporates "some or all

elements" of the Sticky Label Project since the very same labels used for sandwiches

were cut in half and applied to coffee cups when McDonald's began testing the application.  (See Tr. 403-04).

In sum, because there was evidence that the 2003 Contract covered the beverage application for the RoL labels, NCR is not entitled to judgment as a matter of law with respect to this aspect of BGI's claims.

        e.      <u>Damages Award</u>

The final branch of NCR's JMOL motion argues that the jury's award of $7.5 million for BGI's future damages is unsupported by the evidence.  (Def.'s Mem. at 19-21).  In particular, NCR contends that a damages award of this magnitude would have required the jury to engage in improper speculation because there was no adequate foundation from which it could determine the length of time that McDonald's would continue to buy RoL from NCR.  (<u>Id.</u> at 20).

Under New York law, a damages award "may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach."  <u>Kenford Co. v. Erie Cnty.</u>, 67 N.Y.2d 257, 261 (1986).  Nevertheless, "it is always the breaching party . . . who must shoulder the burden of the uncertainty regarding the amount of damages."  <u>Boyce v. Soundview Tech. Grp., Inc.</u>, 464 F.3d 376, 392 (2d Cir. 2006).  Thus, a "plaintiff need only demonstrate a stable foundation for a reasonable estimate[] as to damages."  <u>Id.</u> (internal quotation marks omitted).

Neither BGI's nor NCR's expert witness ventured an opinion as to the number of years that McDonald's would continue to purchase RoL from NCR.  (Tr. 555,

698).  Instead, both experts testified that it was the jury that had to decide the appropriate

forecast horizon.  (Id. at 555, 698).  Dr. Beutel, BGI's expert, nevertheless suggested that

"there [was] a reasonable basis for thinking that perhaps NCR would be able to continue

selling [RoL] to McDonald's at least through [2025] and perhaps beyond that."  (Id. at

546).  NCR's expert, Stamm, took issue with this assertion, testifying that "2025 just

seems way too long in terms of having any confidence that the sales will continue."  (Id.

at 698).

    Contrary to NCR's assertion, Dr. Beutel provided a stable foundation for

his opinion that RoL sales could continue through 2025.  First, NCR has a patent for RoL

that will not expire until April 2026.  NCR consequently has the right to prevent other

competitors from producing a substantially similar product during the lifetime of its

patent.  (Id. at 528).  Moreover, even if McDonald's were able to pressure NCR into

allowing a second vendor to supply the product, NCR still would receive royalties from

licensing its patent to that competitor.  (Id. at 591).  Thus, NCR would receive revenue for

RoL either from McDonald's or from another manufacturer that paid it a licensing fee.

    Second, the relationship between NCR and McDonald's supports Dr.

Beutel's opinion that there was "a reasonable basis" for believing that NCR would

continue to sell RoL to McDonald's through 2025.  At the outset, NCR clearly would not

have devoted several years to developing RoL unless it believed that its sales of the

product to McDonald's would be "substantial."  (Id. at 530).  Indeed, in April 2007, NCR

projected that it would generate revenues of more than $21 million through the sale of

nearly 2.25 million units of RoL to 2,400 McDonald's restaurants in the first five years of

sales alone.  (PX 196).  NCR also noted that its investment to date would permit it to

expand its sales of RoL to 6,200 McDonald's restaurants.  (Id.).  The jury was entitled to

find that both of these forecasts were reasonable since NCR had knowledge of

McDonald's business practices through its prior sales relationship with McDonald's.  (Tr.

528-30).  The fact that McDonald's decided to expand its use of  RoL to beverage

products further confirmed McDonald's enthusiasm for the labels.  (Id. at 529).

In sum, there was more than enough evidence presented at trial to support

the forecast horizon that the jury evidently chose.  NCR's JMOL motion therefore must

be denied insofar as it relates to the damages award.

     2.  Rule 59

NCR also has moved for a new trial pursuant to Rule 59 of the Federal

Rules of Civil Procedure.  Rule 59(a)(1) provides that a new trial may be granted after a

jury trial "for any reason for which a new trial has heretofore been granted in an action at

law in the federal court."  Fed. R. Civ. P. 59(a)(1).  Rule 59 consequently imposes a lower

threshold for the grant of a new trial than Rule 50 does for the grant of judgment as a

matter of law because a trial judge may reassess the evidence and need not view it in the

light most favorable to the nonmovant.  United States v. Landau, 155 F.3d 93, 104 (2d

Cir. 1998).  Accordingly, "a motion for a new trial may be granted even if there is

substantial evidence to support the jury's verdict."  Caruolo v. John Crane, Inc., 226 F.3d

46, 54 (2d Cir. 2000) (quoting id.).  However, despite a trial court's considerable

discretion in this area, <u>see</u> <u>Metromedia Co. v. Fugazy</u>, 983 F.2d 350, 363 (2d Cir. 1992),

it "ordinarily should not grant a new trial unless it is convinced that the jury has reached a

seriously erroneous result or that the verdict is a miscarriage of justice." <u>Hygh v. Jacobs</u>,

961 F.2d 359, 365 (2d Cir. 1992) (quoting <u>Smith v. Lightning Bolt Prods., Inc.</u>, 861 F.2d

363, 370 (2d Cir. 1988)).

       NCR advances two arguments in support of its Rule 59 motion.  First, it

maintains that the Court improperly imposed on NCR the burden of proof with respect to

whether BGI satisfied the representations and warranties in the 2003 Contract.  (Def.'s

Mem. at 21-23).  Second, NCR asserts that the jury's award of future damages was

excessive because that award included commissions for the RoL beverage application,

which NCR contends was not covered by the 2003 Contract.  (<u>See</u> <u>id.</u> at 23-24).  Neither

contention has merit.

       a.     <u>BGI's Representations and Warranties</u>

       In the first branch of its motion, NCR asserts that the "factual

representations" in the 2003 Contract "are properly viewed both as representations and

warranties and as conditions precedent."  (<u>Id.</u> at 22).  NCR further contends that,

regardless of how those representations and warranties are characterized, the instructions

to the jury improperly imposed on NCR the burden of proving that BGI had not satisfied

provisions of the 2003 Contract.  (<u>Id.</u> at 21-23).

       At the outset, NCR's conditions precedent argument is entirely new.  Thus,

NCR did not argue during trial that BGI's representations and warranties in the 2003

46

Contract constituted conditions precedent, nor did NCR request a jury charge based on that theory.  (See Joint Requests to Charge).  Nonetheless, NCR now asserts that BGI's representations and warranties were conditions precedent to the formation of the 2003 Contract itself.  (See Def.'s Reply Mem. at 11).

A party cannot maintain a Rule 59 motion insofar as it is based on a new legal theory that it did not present at trial.  See Sims v. Mme. Paulette Dry Cleaners, No. 82 Civ. 5438 (MEL), 1986 WL 12511, at *1 (S.D.N.Y. Oct. 31, 1986) ("it is not the intention or purpose of [Rule 59] to allow parties . . . to present their case under new theories").  In this case, although NCR voiced objections to the jury instructions concerning BGI's representations and warranties, they were not based on a condition-precedent theory.  (See Tr. 720-21 (objecting on ground that BGI's prima facie case required it to prove that BGI had satisfied its representations and warranties)).  NCR's conditions precedent argument therefore has been waived.  See Baker v. Dorfman, No. 97 Civ. 7512 (DLC), 1999 WL 191531, at *3 (S.D.N.Y. Apr. 6, 1999) (movant waived new argument presented on Rule 59 motion by failing to present it to court or jury during trial), aff'd, 239 F.3d 415 (2d Cir. 2000).  The Court's consideration of this aspect of NCR's Rule 59 motion therefore will be limited to its argument concerning the allocation of the burden of proof with respect to BGI's representations and warranties.[20]

---

[20]     In view of NCR's waiver, there is no need to address its request that the Amended Answer "be deemed further amended to assert the failure to meet the first of these conditions [precedent]."  (Def.'s Mem. at 3 n.2).  In any event, there is no basis for NCR's claim that BGI's representations and warranties in the 2003 Contract constituted conditions precedent.  Those representations and warranties memorialized BGI's assurances to NCR with respect to certain

(continued...)

Under the applicable New York law, a "party asserting a breach of contract claim has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence." Raymond v. Marks, 116 F.3d 466, 466 (2d Cir. 1997) (applying New York law). Similarly, a defendant asserting an affirmative defense bears the burden of proof with respect to that defense. Brignoli v. Balch, Hardy & Scheinman, Inc., 577 N.Y.S.2d 375, 375 (1st Dep't 1991); see also Peguero v. 601 Realty Corp., 873 N.Y.S.2d 17, 21 (1st Dep't 2009) (corporate officer defendant bore burden of proof for affirmative defense that he was not liable for acts of corporation). Accordingly, when a defendant alleges that a plaintiff's breach of a warranty contained in the contract excuses the defendant's nonperformance, the defendant has the burden of proving that defense. See Valentini v. Metro. Life Ins. Co., 94 N.Y.S. 758, 760 (1st Dep't 1905).

Here, as part of BGI's prima facie case, it had to establish that it satisfactorily performed under the 2003 Contract. Furia v. Furia, 498 N.Y.S.2d 12, 13 (3d Dep't 1986); see Hecht v. Components Int'l, Inc., 867 N.Y.S.2d 889, 895 (Sup. Ct. Nassau Cnty. 2008). During the charging conference, NCR contended that, because BGI's performance obligations under the 2003 Contract included a requirement that it

---

[20](...continued)
facts regarding BGI's preexisting relationship with McDonald's. See CBS Inc. v. Ziff-Davis Pub. Co., 75 N.Y.2d 496, 503 (1990) (quoting Metro. Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir. 1946)) (defining warranty as "an assurance by one party to a contract of the existence of a fact upon which the other party may rely"). The representations and warranties thus did not describe an act or event that had to occur before NCR's and BGI's respective duties arose under the 2003 Contract. A condition precedent, however, is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." See Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 690 (1995) (internal quotation marks omitted).

satisfy its representations and warranties, the burden of proof with respect to that issue

rested with BGI.  (See Tr. 720).  In advancing that argument, however, NCR overlooked

the fact that its claim that BGI's representations and warranties were untrue is an

affirmative defense.  As such, NCR properly bore the burden of proof on this issue at

trial.  See Brignoli, 577 N.Y.S.2d at 375.  Insofar as BGI's prima facie breach of contract

case is concerned, BGI satisfied its obligation of establishing performance with respect to

its representations and warranties merely by showing that it made them, thereby assuring

NCR that NCR could rely on the facts set forth therein.  See CBS, 75 N.Y.2d at 503.

       NCR's defense that BGI breached its representations and warranties is

essentially a breach of contract claim that NCR pleaded as a counterclaim in its amended

answer.  (See ECF No. 5 ("Am. Answer") ¶¶ 16-20).  Accordingly, because NCR asserted

that claim, NCR had the burden of establishing it by a preponderance of the evidence.

See Raymond, 116 F.3d at 466.  Contrary to NCR's argument, (see Def.'s Reply Mem. at

12), it is of no moment that NCR did not seek any indemnification as a consequence of

BGI's alleged breach of its representations and warranties.  That NCR did not seek

recovery for the alleged untruthfulness of BGI's statements does not alter the allocation

of the burden of proof with respect to NCR's affirmative defense.  See Irv-Bob Formal

Wear, Inc. v. Pub. Serv. Mut. Ins. Co., 366 N.Y.S.2d 596, 601 (N.Y. City Civ. Ct. 1975)

(defendant bore burden of proof for breach-of-warranty defense even though it did not

assert counterclaim for plaintiff's alleged breach).

The instructions to the jury thus properly imposed on NCR the burden of proof with respect to its defense that BGI failed to satisfy the representations and warranties in the 2003 Contract.

b.   Damages

NCR's other claim under Rule 59 is that the damages awarded by the jury for BGI's future sales commissions were excessive because they included commissions on RoL sales attributable to the beverage application.  (Def.'s Mem. at 23).  NCR requests a new trial on damages for two reasons.  First, NCR contends that the Court "erroneously denied NCR's request to charge that the jury could not award damages for beverage."  (Id.).  Second, NCR contends that the verdict sheet should have required that the jury segregate damages arising out of the use of RoL labels on sandwiches from those arising out of their use on beverages.  (Id. at 23-24).

Before the trial began, NCR requested a jury charge that, in effect, sought judgment as a matter of law on the issue of BGI's damages to the extent they related to beverage applications.  (Joint Requests to Charge at 24).  That proposed charge, which was refused, stated:  "You may not award Barton Group any damages on account of the use of linerless labels for any non-sandwich application."  (Id.; see Tr. 758-74).  As set forth above, whether the 2003 Contract covered sales of RoL attributable to the beverage application was a question of fact for the jury because the language of the 2003 Contract concerning the "Alternative Project" was ambiguous.  It follows that it was proper to allow the jury to determine whether BGI was entitled to any damages arising out of

50

NCR's failure to pay commissions attributable to the beverage application.  The Court therefore did not err by declining to give NCR's requested charge.

NCR's second contention regarding damages resurrects an objection that it made at trial regarding the damages section of the verdict sheet.  Specifically, NCR requested that the verdict sheet require the jury to segregate BGI's damages attributable to the RoL sandwich application from those attributable to the RoL beverage application. (Tr. 746).  As NCR's counsel explained, NCR wanted to ensure that the jury made a "conscious decision" to award damages for the beverage application in the event that it determined BGI was entitled to damages.  (Id.).  After considering NCR's objection, the Court asked NCR to propose alternative language for the relevant questions.  (Id.).  With only a minor modification, the Court adopted NCR's proposed language, which simply clarified that the jury could award damages only for "product(s) covered by the 2003 contract."  (See id. at 749-50).  Having indicated through its counsel that the revised language in the verdict sheet was "fine," NCR cannot now rely on the failure to ask a separate question concerning the beverage application as the basis for a new trial.  See Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 61 (2d Cir. 2002) (failure to make a specific objection before jury retires to deliberate limits review to circumstances in which the allegedly defective instruction is "so serious and flagrant that it goes to the very integrity of the trial").  In any event, the mere fact that the verdict sheet did not have separate damages questions for each RoL application does not mean that the jury failed to consider separately the damages applicable to each potential use of RoL.

51

After asking the jury to answer questions related to and whether the RoL labels fell within the scope of the 2003 Contract, the verdict sheet posed the following additional questions:

> 6. . . . [W]hat amount of money would fairly and reasonably compensate The Barton Group for the damages caused by NCR's breach of contract with respect to NCR's refusal to pay 4% commissions to The Barton Group based on NCR's actual past sales to McDonald's of product(s) <u>covered by the 2003 [C]ontract</u> from April 2008 through August 31, 2010?
>
> 7. . . . [W]hat amount of money would fairly and reasonably compensate The Barton Group for the damages caused by NCR's breach of contract with respect to NCR's sales to McDonald's of product(s) <u>covered by the 2003 [C]ontract</u> on and after September 1, 2010 in the United States?

(Decl. of Sean Sheely, dated Jan. 7, 2011 ("Sheely Decl."), Ex. 3 at 3 (emphasis added)). As these questions were worded, had the jury determined that the beverage application was not one of the "product(s) covered by the 2003 [C]ontract," it would not have awarded any damages for that application. The verdict sheet therefore did not prevent the jurors from making a "conscious decision" regarding BGI's entitlement to damages for the beverage application.[21]

In sum, contrary to NCR's assertions, the jury's damages award was not excessive merely because it may have included commissions on the beverage application.

---

[21]     Because both NCR and BGI presented spreadsheets that provided separate damages estimates for the beverage and sandwich applications, (see, e.g., PX 355, 362-65; DX AN), the jury had the information it needed if it wished to exclude the damages related to either application.  In fact, the jury requested those exhibits during its deliberations.  (Tr. 871)

NCR's motion for a new trial with respect to its damages claim consequently must be denied.

      B.    <u>BGI's Motions</u>

           BGI's post-trial motions seek relief related to NCR's future sales of RoL to McDonald's international restaurants.  Specifically, BGI seeks (i) a declaratory judgment that the 2003 Contract "remains in full force and effect with respect to [NCR's] obligations to pay [BGI] commissions" on NCR's future international sales, and (ii) an order of specific performance compelling NCR to pay those commissions.  (ECF No. 53 ("Pl.'s Mem.") at 1).  In its opposition papers, NCR contends that BGI's application to treat the 2003 Contract as remaining in effect insofar as international sales are concerned is inconsistent with its prior election of damages at trial, and, accordingly, must be denied.  (ECF No. 55 ("Def.'s Opp'n Mem.") at 1-2).

         1.    <u>Declaratory Judgment</u>

           During the course of the trial, BGI argued, and the jury agreed, that NCR had anticipatorily repudiated the 2003 Contract by suspending its commission payments to BGI in 2008.  (Tr. 874-75).  An "[a]nticipatory repudiation occurs when, before the time for performance has arisen, a party to the contract declares his intention not to fulfill a contractual duty."  <u>Lucente v. Int'l Bus. Machs. Corp.</u>, 310 F.3d 243, 258 (2d Cir. 2002).  The nonrepudiating party — in this case, BGI — then "has two mutually exclusive options[:]"  it may "(a) elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation

between the parties, or (b) . . . continue to treat the contract as valid and await the designated time for performance before bringing suit." Id. (citing Inter-Power of N.Y. Inc. v. Niagara Mohawk Power Corp., 686 N.Y.S.2d 911, 913 (3d Dep't 1999)). What the nonrepudiating party cannot do is "at the same time treat the contract as broken and as subsisting. One course of action excludes the other." Strasbourger v. Leerburger, 233 N.Y. 55, 59 (1922). Moreover, once an election has been made, it cannot be changed. Lucente, 310 F.3d at 258-59. In determining which remedy the nonrepudiating party has elected, "the operative factor is whether [it] has taken an action (or failed to take an action) that indicated to the breaching party that [it] had made an election." Id. at 259 (ellipsis and internal quotation marks omitted).

In this action, BGI has impermissibly pursued two inconsistent remedies for NCR's breach of the 2003 Contract. First, BGI's conduct after it learned that NCR had decided to suspend its commission payments indicated that BGI elected to treat NCR's anticipatory repudiation as the end of the 2003 Contract. Among other things, BGI took no steps to continue to perform under the 2003 Contract from that date forward, and it had no further contact with NCR concerning the Sticky Label Project. (See Tr. 210). BGI also elected to commence this suit before it had a basis to estimate its lost commissions on international sales. Since a breach of contract action in New York State is subject to a six-year statute of limitations, see N.Y. C.P.L.R. § 213, BGI could have waited until its lost commissions on international sales were ascertainable. These actions

establish that BGI had elected to terminate the 2003 Contract as a consequence of NCR's breach.  See Lucente, 310 F.3d at 258.

Despite that decision, BGI seeks a declaratory judgment that the 2003 Contract remains in effect with respect to NCR's obligation to pay BGI commissions, as they come due, on international sales of RoL.  Importantly, BGI's application for that relief is based on the very same conduct for which it sought to recover damages at trial — namely, NCR's repudiation of the 2003 Contract in 2008.  Pursuant to the election-of-remedies doctrine, however, BGI cannot treat the 2003 Contract as "in full force and effect" with respect to one aspect of NCR's performance and simultaneously treat it as having been terminated with respect to other aspects of NCR's performance.  See id. at 258-59 ("Once a party has elected a remedy for a particular breach, his choice is binding with respect to that breach and cannot be changed.").  BGI therefore cannot seek any continued performance under the 2003 Contract.  See ESPN, Inc. v. Office of the Comm'r of Baseball, 76 F. Supp. 2d 383, 389 (S.D.N.Y. 1999) (nonrepudiating party that elects to terminate contract "cannot continue to . . . expect performance under the contract").

In its papers, BGI contends that Lucente v. International Business Machines Corp., 310 F.3d 243 (2d Cir. 2002), is inapposite.  (See ECF No. 60 ("Pl.'s Reply Mem.") at 4).  In Lucente, the district court permitted the plaintiff to elect inconsistent remedies after his former employer sent him a letter canceling two incentive compensation plans.  310 F.3d at 258.  The Second Circuit held, however, that the plaintiff could not elect to terminate one plan and, simultaneously, treat the other plan as valid.  As the court

explained:  "Apart from allowing [the plaintiff] to have his cake and eat it too, such a result is antithetical to the common law precepts of anticipatory repudiation and the election of remedies doctrine." <u>Id.</u> at 258.  BGI attempts to distinguish <u>Lucente</u> on the ground that the plaintiff there did not seek "hybrid relief combining equitable and legal remedies."  (Pl.'s Reply Mem. at 4).  BGI cannot ignore the fact, however, that its requested relief — both termination and continuation of the 2003 Contract— is no less inconsistent than the <u>Lucente</u> plaintiff's attempt to "have his cake and eat it too."  <u>Lucente</u>, 310 F.3d at 258.  Under New York law, BGI cannot "at the same time treat the contract as broken and as subsisting."  <u>Strasbourger</u>, 233 N.Y. at 59.  BGI therefore is not entitled to any declaratory relief with respect to future international sales.

       2.      <u>Specific Performance</u>

      BGI's motion also seeks an order requiring NCR to pay BGI sales commissions on future international sales of RoL pursuant to the 2003 Contract.  Such "hybrid relief," according to BGI, is necessary for it to "obtain complete relief as a result of NCR's breach."  (Pl.'s Reply Mem. at 4).  Because BGI's application for specific performance is as inconsistent with its election to declare the 2003 Contract at an end as its application for a declaratory judgment, this aspect of its motion also must be denied.

      Moreover, specific performance is an "extraordinary" remedy for which the requesting party "must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice."  <u>Lucente</u>, 310 F.3d at 262.  "A court may grant specific performance where money damages would not suffice, such as when 'the subject matter

56

of the particular contract is unique and has no established market value.'"  DiPilato v.

7-Eleven, Inc., 662 F. Supp. 2d 333, 345 (S.D.N.Y. 2009) (citing Sokoloff v. Harriman

Estates Dev. Corp., 729 N.Y.S.2d 425, 429 (2001)).  "In determining whether money

damages would be an adequate remedy, a trial court must consider, among other factors,

the difficulty of proving damages with reasonable certainty and of procuring a suitable

substitute performance with a damages award."  Sokoloff, 729 N.Y.S.2d at 429; see also

Restatement (Second) of Contracts § 360 (1981) (trial court should also consider the

"likelihood that an award of damages could not be collected").  Ultimately, whether to

award specific performance is within the trial court's "sound discretion."  Sokoloff, 729

N.Y.S.2d at 429.

      Here, BGI seeks specific performance of the 2003 Contract with respect to

its commissions on future international sales of RoL only because BGI's expert could not

estimate those damages without engaging in undue speculation.  (Pl.'s Mem. at 5).  The

request for specific performance thus is essentially the alter ego of BGI's request for

declaratory relief.  As noted above, however, BGI's present difficulties could have been

avoided had BGI waited to commence its lawsuit against NCR until a more robust set of

international sales data existed.

      BGI's requested relief also would require NCR to pay BGI money as long

as NCR continues to sell RoL, or any other product covered by the 2003 Contract, to

McDonald's.  Because the 2003 Contract lacks a defined end date, this would require

NCR to pay BGI commissions for an indefinite period of time.  The payment of money,

however, is not typically considered to be a performance so unique as to warrant specific performance.  See DiPilato, 662 F. Supp. 2d at 345; cf. Restatement (Second) of Contracts § 360 cmt. c (1981) ("If the injured party can readily procure by the use of money a suitable substitute for the promised performance, the damage remedy is ordinarily adequate.").  Indeed, each of the cases on which BGI relies involve unique circumstances not present in this action.  See Sheet Metal Workers' Int'l Ass'n Local 19 v. Herre Bros., Inc., 201 F.3d 231, 250 (3d Cir. 1999) (upholding order of specific performance requiring employer to hire union workers for nine months in accordance with plaintiff's collective bargaining agreement); First State Bank of Floodwood v. Jubie, 86 F.3d 755, 760-61 (8th Cir. 1996) (vacating district court's award of future damages for bank's breach of retirement agreement with former president because the "large lump-sum judgment" would "adversely impact" the bank, and requiring, instead, that bank pay former president monthly fixed payments pursuant to the agreement); Granite Broadway Dev. LLC v. 1711 LLC, 845 N.Y.S.2d 10, 10-11 (1st Dep't 2007) (upholding trial court's award of damages and specific performance in action involving breach of a construction contract); Camperlino & Fatti Builders, Inc. v. Dimovich Constr. Corp., 572 N.Y.S.2d 255, 256 (4th Dep't 1991) (upholding trial court's award of damages when specific performance was not possible because defendants no longer owned property at issue).

        In sum, because BGI's request for specific performance is essentially the same as its request for declaratory relief, and no less inconsistent with its decision to seek

its presently ascertainable damages, BGI is not entitled to specific performance of any aspect of the 2003 Contract.

IV.    Conclusion

For the reasons set forth above, NCR's motions for judgment as a matter of law and a new trial, (ECF No. 48), are denied, as is BGI's motion for declaratory judgment and an order of specific performance, (ECF No. 51).

SO ORDERED.

Dated:        New York, New York
              June 24, 2011

FRANK MAAS
United States Magistrate Judge

Copies to:

Sean Sheely, Esq.
Holland & Knight LLP
31 West 52nd Street
New York, New York 10019

Ira G. Greenberg, Esq.
Edwards Angell Palmer & Dodge, LLP
750 Lexington Avenue
New York, New York 10022